[No. 10997-6-III.   Division Three.   January 21, 1992.]

BERNICE BAYS, *Individually and as Personal Representative, Appellant*, v. ST. LUKE'S HOSPITAL, *Defendant*, HARVEY DEWITT, *Respondent*.

*Marcia M. Meade* and *Dawson & Meade, P.S.,* for appellant.

*Curtis L. Shoemaker, Milton G. Rowland,* and *Paine, Hamblen, Coffin, Brooke & Miller,* for respondent.

SHIELDS, C.J. — Bernice Bays, individually and as personal representative of the estate of her husband, William Bays, brought this wrongful death action against Harvey DeWitt, M.D., and St. Luke's Hospital d/b/a Valley Hospital (Valley General), alleging medical negligence and failure to secure informed consent for additional treatment. Before trial, the court dismissed the informed consent claim against Valley General as a matter of law. At the close of evidence, the court dismissed the informed consent claim against Dr. DeWitt. The court submitted the medical negligence claims against both Dr. DeWitt and Valley General to the jury, which returned defense verdicts. Ms. Bays moved for a new trial and for judgment notwithstanding the verdict. The court denied both motions. Ms. Bays appeals, and we affirm.

On August 31, 1983, at about 10:30 a.m., Mr. Bays was injured at his place of employment, Dellen Wood Products, when an 800-pound spool of wire strapping he was attempting to lift fell on him. He was taken by ambulance to Valley General and examined by the emergency room physician who referred him to Dr. DeWitt, an orthopedic surgeon. Dr. DeWitt admitted Mr. Bays to the hospital with a diagnosis of dislocated right shoulder, which had been reduced (relocated) in the emergency room, and mild compression fractures of 12 vertebrae in his back. Dr. DeWitt ordered bed rest and intravenous (IV) fluids for Mr. Bays. Dr. DeWitt told Mr. Bays it was important for him to move his legs to prevent blood clots from developing and prescribed antiembolism stockings (knee-high TED hose) for Mr. Bays to

wear. At 9 p.m. on August 31, Dr. DeWitt examined Mr. Bays and found his condition was stable.

On September 1, Mr. Bays complained of severe shooting pains on the inside of his left knee. On September 2, Dr. DeWitt examined the knee, found no blood or fluid in the joint, ordered a precautionary knee X-ray and diagnosed a mild sprain of the knee ligament.

On September 3, Dr. DeWitt discontinued the IV fluids, permitted Mr. Bays to start drinking fluids and eating soft food, ordered oral pain medicine and an X-ray of the right foot, which he noted was swollen. At 4 p.m. on September 3, Mr. Bays' temperature spiked to 102.4 degrees Fahrenheit. Dr. DeWitt ordered a chest X-ray to check Mr. Bays' pulmonary function because he was concerned about four medical problems which could cause elevated temperature: pneumonia; atelectasis, which results from lung collapse; blood absorption, which results from bleeding around fractures; and thromboembolism.[1]

On September 5, Mr. Bays' temperature returned to normal; he was voiding with little effort and denied having any pain. Mr. Bays' lungs were clear when his breath sounds were heard through a stethoscope. The chest X-ray was negative for all of the four medical problems Dr. DeWitt had in mind.

In the early morning hours of September 6 Mr. Bays had, for the first time, full blown symptoms of a pulmonary embolism. He died at 5:40 a.m.

# I
## INFORMED CONSENT

At the close of evidence both Ms. Bays and Dr. DeWitt moved for a directed verdict on the issue of informed con-

---

[1]An embolism is an object moving through the circulatory system. A thrombus is a blood clot. A thromboembolism is a blood clot moving through the venous system, *i.e.*, usually through the veins toward the heart. A pulmonary embolism is a thromboembolism that has moved along the venous system, passed through the right side of the heart and lodged in a pulmonary artery leading to a lung. Phlebitis is an inflammation of the veins due to any of a number of causes. Thrombophlebitis is a phlebitis with secondary blood clot formation.

sent. The court granted Dr. DeWitt's motion and denied Ms. Bays'. Ms. Bays contends her motion should have been granted. A trial court may grant a motion for a directed verdict only if there is no evidence or reasonable inference which would support a jury verdict in favor of the nonmoving party. Likewise, the denial of a motion for a directed verdict should be reversed only if no evidence or reasonable inference exists which would be sufficient to sustain a verdict for the nonmoving party. *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989); *Radford v. Hoquiam*, 54 Wn. App. 351, 355, 773 P.2d 861 (1989).

Informed consent focuses on the patient's right to know about a bodily condition and to make decisions about that condition. A physician has a duty to disclose an abnormality which may indicate risk or danger in the patient's body. *Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 622 P.2d 1246 (1980); *Gates v. Jensen*, 92 Wn.2d 246, 595 P.2d 919 (1979); *Miller v. Kennedy*, 11 Wn. App. 272, 522 P.2d 852 (1974), *aff'd*, 85 Wn.2d 151, 530 P.2d 334 (1975). In 1976 the Legislature adopted RCW 7.70 relating to actions for injuries resulting from health care. RCW 7.70.030 sets forth the three alternative propositions which must be established to support an award for damages for injury resulting (1) from a failure to follow the accepted standard of care, (2) after the health care provider promises injury would not occur, and (3) from health care to which consent was not given.

To impose liability on a physician for violation of RCW 7.70.030(3), the plaintiff must prove pursuant to RCW 7.70.050(1): (a) the physician failed to inform the patient of a material fact relating to treatment; (b) the patient consented to treatment without being aware of that fact; (c) a reasonably prudent patient under similar circumstances would not have consented given such information; and (d) the treatment in question proximately caused injury to

the patient. *Bertsch v. Brewer*, 97 Wn.2d 83, 640 P.2d 711 (1982).

■ ■ A material fact is defined by RCW 7.70.050(2) as one to which significance would be attached in deciding whether or not to submit to the proposed treatment and has been defined by case law to mean a possible risk of a serious nature. *Ruffer v. St. Frances Cabrini Hosp.*, 56 Wn. App. 625, 630, 784 P.2d 1288, *review denied*, 114 Wn.2d 1023 (1990). *Smith v. Shannon*, 100 Wn.2d 26, 33, 666 P.2d 351 (1983) enunciated the working rule for disclosure of a given risk as a 2-step process:

> Initially, the scientific nature of the risk must be ascertained, *i.e.*, the nature of the harm which may result and the probability of its occurrence. The trier of fact must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment.

(Citations omitted.) Expert testimony is required to establish the first step in the process: to prove the existence of a risk, its likelihood of occurrence, and the type of harm in question; the second step requires no expert testimony. *Smith*, at 33-34.

■ ■ Ms. Bays interprets RCW 7.70 as imposing upon physicians the duty to disclose material facts relating to treatment of conditions which have not been diagnosed by the physician. She argues Dr. DeWitt had a duty to disclose to Mr. Bays all possible methods of treatment for thrombophlebitis, thromboembolism and pulmonary embolism on September 3 because Dr. DeWitt's differential diagnosis included thromboembolism. This is not the law in Washington. As clearly stated in *Burnet v. Spokane Ambulance*, 54 Wn. App. 162, 772 P.2d 1027, *review denied*, 113 Wn.2d 1005 (1989), the duty to disclose does not arise until the physician becomes aware of the condition by diagnosing it.

A physician's failure to diagnose a condition is a matter of medical negligence, not a violation of the duty to inform the patient. Informed consent and medical negligence are alternate methods to impose liability. *Burnet*, at 168-69; *see*

RCW 4.24.290. Here, it is undisputed Dr. DeWitt did not diagnose the condition of thromboembolism in Mr. Bays. Ms. Bays' action for medical negligence is based on Dr. DeWitt's failure to diagnose the thromboembolism which manifested itself in the early morning hours of September 6 and resulted in the sudden fatal pulmonary embolism. Before then, Dr. DeWitt was unaware of the thromboembolism condition. Thus, Ms. Bays is unable to establish the first element of the informed consent cause of action. The court did not err in denying Ms. Bays' motion and directing a verdict in Dr. DeWitt's favor on the issue of informed consent.

## II
### SUBSTANTIAL EVIDENCE

Next, Ms. Bays contends there was sufficient evidence to deny Dr. DeWitt's motion for directed verdict and grant her motions for directed verdict and new trial on the issue of informed consent. The evidence upon which she relies is the undisputed fact Dr. DeWitt did not administer a venogram to Mr. Bays on September 3. She asserts it was negligence not to administer that test to confirm the existence of a thromboembolism. Furthermore, had Dr. DeWitt administered that test, Mr. Bays could have consented to an implant of a Greenfield Filter to catch the thromboembolism in the venous system before it became a pulmonary embolism, the cause of his death. The assertion and argument is a transparent attempt to disguise a negligence issue as a failure to obtain an informed consent issue on both the diagnostic test and the medical treatment.

Ms. Bays argues because Dr. DeWitt considered thromboembolism in his differential diagnosis it was "not reasonably prudent to not tell the patient of the diagnostic test and make a unilateral decision that such diagnostic tests were not going to be done." The argument ignores what a differential diagnosis entails: an identification of possible bodily conditions causing the patient's presenting symptoms. *Stedman's Medical Dictionary* 437 (21st ed.

1966). A failure to diagnose a condition, as we have indicated above, is a matter of medical negligence. We decline to create a second or alternate cause of action on informed nonconsent to a diagnostic procedure predicated on the same facts necessary to establish a claim of medical negligence.

Essentially, Ms. Bays' reasoning is as follows. Dr. DeWitt's differential diagnosis included a possible thromboembolism; a venogram is an objective test to rule out a possible thromboembolism; a venogram was not administered; if a venogram had been administered, it would have revealed a thromboembolism, which is a material fact concerning a patient's condition; the treatment for the condition is to insert a Greenfield Filter; the patient would have consented to the treatment; and death would not have been the result. That reasoning is faulty. The testimony of Ms. Bays' expert, Eugene Strandness, M.D., identified only two symptoms that were of concern to him on September 3: (1) the pain in the knee on September 2; and (2) the swollen foot the next day. Although Dr. Strandness was of the opinion it is the standard of care to order a venogram at that point in time, he also testified that thrombi may not be detectable beginning within 3 to 5 days of injury, and neither their signs nor their symptoms are specific. The jury did not accept this standard of care when it decided the issue of medical negligence.

Critical to the issue on informed consent, Dr. Strandness also testified a pulmonary arteriogram or profusion lung scan would identify pulmonary emboli in the lungs, but acknowledged that no pulmonary emboli had gone to Mr. Bays' lungs until 3:30 a.m. September 6 and if performed on September 3, the tests would have been negative. Thus, there would have been no reason to insert a Greenfield Filter, for which informed consent would have been required, or to carry out any other diagnostic procedure or medical treatment for thrombophlebitis or thromboembolism.

There was substantial evidence to deny Ms. Bays' motion for directed verdict on the issue of informed consent and her motion for new trial.

## III
### TESTIMONY OF EXPERT WITNESSES

■ Ms. Bays contends the court erred in permitting Dr. DeWitt to elicit opinions from all defense experts on the issues of liability and proximate cause when Ms. Bays presented only one expert on those issues. More accurately, the issue here is whether the court abused its discretion in permitting Dr. DeWitt to call one expert physician witness and Valley General, not a party to this appeal, to call two expert physician witnesses when Ms. Bays called only one expert physician witness. Dr. DeWitt also testified, as an expert physician, on his own behalf, and he was called as an adverse witness by Ms. Bays. All of the expert physician witnesses testified concerning their opinions on liability and proximate cause. The admission of cumulative evidence lies largely within the sound discretion of the trial court and no error exists absent an abuse of that discretion. ER 104(a); ER 403; *Goodell v. ITT-Federal Support Servs., Inc.*, 89 Wn.2d 488, 573 P.2d 1292 (1978); *Lockwood v. AC&S, Inc.*, 44 Wn. App. 330, 722 P.2d 826 (1986), *aff'd*, 109 Wn.2d 235, 744 P.2d 605 (1987).

■ As between Dr. DeWitt and Ms. Bays, each in fact called one independent expert physician witness. The fact Valley General, which by Ms. Bays' choice is not a party to this appeal, called two expert physician witnesses is not relevant to the issues between Dr. DeWitt and Ms. Bays. A showing of manifestly unreasonable exercise of discretion or exercise of discretion based upon untenable grounds or reasons is required in order to establish abuse of discretion. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 77, 684 P.2d 692 (1984). An appellate court will not overturn a discretionary ruling absent a showing of abuse. *Miller v. Peterson*, 42 Wn. App. 822, 714 P.2d 695, *review denied*, 106 Wn.2d

1006 (1986). Ms. Bays has failed to establish an abuse of discretion by the court.

## IV
### HOSPITAL STANDARDS

Ms. Bays contends the trial court erred in refusing to admit evidence of voluntary hospital standards promulgated by the Joint Commission on Accreditation of Hospitals (JCAH). She sought to introduce a specific JCAH standard entitled "Statement of Patient Rights and Responsibilities"[2] as evidence of a standard of care and informed consent during the cross examination of Dr. DeWitt. The court refused its introduction.

Ms. Bays' reliance on *Pedroza v. Bryant*, 101 Wn.2d 226, 677 P.2d 166 (1984), which expressly adopted the theory of corporate negligence of hospitals in exercising an independent duty of patient care, is misplaced. The specific JCAH standard here may have been applicable to Valley General; however, the hospital is not a party to this appeal.[3]

The scope of cross examination is within the sound discretion of the trial court. *Falk v. Keene Corp.*, 53 Wn. App. 238, 250, 767 P.2d 576, *aff'd*, 113 Wn.2d 645, 782 P.2d 974 (1989). It must be decided in the context of the evidence submitted, and the foundation and purposes proposed for the introduction of that evidence. *Supanchick v. Pfaff*, 51 Wn. App. 861, 867-68, 756 P.2d 146 (1988). Ms. Bays was thus required to establish its relevance to Dr. DeWitt's care. She did not do so. Dr. DeWitt's standard of care is

---

[2] The record does not include the statement, but Ms. Bays cites *Miller v. Kennedy*, 11 Wn. App. 272, 293, 522 P.2d 852 (1974), *aff'd*, 85 Wn.2d 151, 530 P.2d 334 (1975) which contains a 1972 version promulgated by the American Hospital Association.

[3] Her reliance on two product liability cases, *Bayne v. Todd Shipyards Corp.*, 88 Wn.2d 917, 568 P.2d 771 (1977) and *Nordstrom v. White Metal Rolling & Stamping Corp.*, 75 Wn.2d 629, 453 P.2d 619 (1969), is misplaced because standards adopted by private parties are admissible on the issue of negligence when shown to be reliable and relevant; however, they do not amount to negligence per se.

prescribed by statute. As to him, the JCAH standard is immaterial. There was no abuse here.

## V
### ALLOCATION OF COSTS AND DENIAL
### OF POSTTRIAL MOTIONS

■ Ms. Bays assigned error to the court's allocation of costs at the close of trial; however, she failed to present argument or citation of authority in support of her assignment. Therefore, this assignment will not be considered on appeal. RAP 10.3(a)(3), (5); *American Legion Post 32 v. Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991); *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 46, 785 P.2d 815 (1990).

■ Ms. Bays failed to assign error to the court's denial of her posttrial motions in her opening brief and raised the issue for the first time in her reply brief. This court will not consider the issue. *McKee v. American Home Prods. Corp.*, 113 Wn.2d 701, 705, 782 P.2d 1045 (1989); *see In re Marriage of Sacco*, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990); *Stevens v. Security Pac. Mortgage Corp.*, 53 Wn. App. 507, 519, 768 P.2d 1007, *review denied*, 112 Wn.2d 1023 (1989); *State v. Manthie*, 39 Wn. App. 815, 826 n.1, 696 P.2d 33, *review denied*, 103 Wn.2d 1042 (1985); RAP 10.3(c).

Dr. DeWitt requests costs on appeal pursuant to RAP 18.1 and RCW 4.84. He is entitled to his costs, including statutory attorney fees, on appeal upon complying with RAP 14.4.

The judgment of the Superior Court is affirmed.

MUNSON, J., and GREEN, J. Pro Tem., concur.

Review denied at 119 Wn.2d 1008 (1992).